By the Court :
The sale of the decedent’s real estate, in this ease, must be sustained, if at all sustainable, upon one of two grounds. It must be-shown that the statute law of the state authorized it by a fair construction of its terms, or that a course of judicial decision has so sanctioned the mode of proceeding *as to give it the authority of law. If either of these two grounds can be satisfactorily established the sale is valid; if neither is tenable, it is inoperative.-
The judgment was rendered in August, 1806, the sale took place in December of the same year. The act of February, 1805, “defining the duties of administrators on wills and intestates’ estates, and providing for the appointment of guardians,” was the only statute law then in force, 'defining the powers, duties, and liabilities of executors and administrators. It gave no power or control to either, over the lands of a deceased person. But, in all its provisions, limited their functions to the control of the personal estate. The defendant’s counsel does not look to the law, regulating the duties of executors and administrators, for authority to effect the *446 sale. He attempts to deduce it from the general law, “regulating judgments and executions,” which was then in force, passed February 16, 1805. We will examine the provisions of this law, and endeavor to ascertain whether they contain anything to warrant the sale of a decedent’s lands, upon a judgment against his personal representative.
Section 1 provides, “ that all lands, tenements, and real estate, shall be liable to be levied upon and sold by execution, to be issued on judgments, which may hereafter be recovered in any court of record within this state, for the debt, damages, and costs due and owing on such judgment.”
If these terms were to be taken in the unlimited sense of their expression, they might be interpreted to subject all lands to the payment of any judgment. The injustice, as well as the ridiculous absurdity of such an interpretation, puts it out of the question. The legislature only meant to declare that the real estate of a debtor should be liable to be seized in execution for the satisfaction of his debts. In what case, and under what circumstances it should be so seized, was to be subsequently provided for by law. And in the succeeding sections of the act it is distinctly shown that it is only the real estate of the defendant, in the judgment, that is made liable for its satisfaction. Section 2 confines the lien to “the lands, tenements, and real estate of the defendant.” Sections 3, 4, and 5 settle the right of preference between several plaintiffs, having judgments against the same defendant. ^Section 6 provides, “ that any execution to be levied on lands, tenements, or real estate, shall command the officer to whom it is directed, that of the goods and chattels of the party against whom it is issued, he cause to be made the moneys contained in said writ, and that for want of goods and chattels he cause the same to be made of the lands and tenements and real estate of the defendant.” Section 7 provides “ that the sheriff shall, immediately after receiving such writ, levy on the goods and chattels of the defendant, to satisfy the moneys contained in the writ; but if goods and chattels be not found, the sheriff shall indorse on the writ the words nulla bona, and forthwith levy the said execution on the lands, tenements, and real estate of the defendant, of which said defendant was seized, at or after the first day of the term in which said judgment was obtained.”
We can conceive of no process by which, according to the established form of proceeding against executors or administrators, the *447 lands of a decedent can be reached, in virtue of these provisions, upon an execution against either. An exposition of the forms of pleading, and of judgments against the executor or administrator, seems to place this in a clear point of light.
In an action against an executor, if he have funds in his hands to pay the debt, the judgment against him is, that the plaintiff recover his debt, to be levied of the goods and chattels of the deceased, in his hands to be administered. If, on execution upon such a judgment, nulla bona be returned, the proper step is, to proveed personally against him for a devastavit, in which case judgment goes against the person of the executor and subjects his individual estate, and if necessary, ultimately that of his security. On a judgment in this form no execution could issue to reach the decedent’s land, conformable to the provisions of the law.
Again, if the executor plead plene administravit, and the plea be found for him, the judgment is, that the plaintiff recover his debt, to be levied of the goods and chattels of the decedent, that may hereafter fall into the hands of the executor. If the plea be found against him the judgment goes against him personally. It is beyond all doubt that no execution could issue upon either of these judgments, by which the decedent’s lands could be touched consistent with the law then in force.
^Further: Should the executor plead that he had fully administered all the goods and chattels in his hands to be administered, and should the plaintiff reply, that the decedent died possessed of real estate, would not such a replication be manifestly bad? The executor has no power over the real estate. He can not convert it into assets, and, consequently, can not be made liable npon account of it. An issue joined upon such a replication, would be an immaterial one, and, upon a demurrer, judgment must be given for the defendant. If the lands of the decedent, in 1806, were assets in the hands of the executor, they must have been, in some form, a matter of investigation, and liable to ba rendered subject to the judgment in the case by a direct adjudication. Unless this was the case, a strange anomaly would exist. On a judgment against an executor, property could be seized in execution, and made liable to its satisfaction, in which the defendant had no interest, and respecting which he could be called to no account. There is nothing in the law that indicates an intention, *448 on the part of the legislature, to introduce this absurd anomaly. But, as we think, much that indicates the contrary.
When suit is brought against an executor, he is, emphatically, and to every intent and purpose, the defendant. In his hands the goods and chattels of the deceased are so far his own, as to be properly levied upon in an execution on a judgment against him as executor. But this can, with no color of justice, be alleged of the decedent’s lands.
The sixth section of the act which provides for levying the execution on land, is very particular in directing how it shall issue. “Any execution to be levied on lands, tenements, or real estate, shall command the officer ’’ to make the money of the goods and chattels, and for want of goods, “ of the lands, tenements, and real estate of the defendant.” Under this law, could an execution issue on a judgment against an executor, commanding the officer to make the money of the goods and chattels in his hands to be administered, and for want of such goods and chattels, of the lands, tenements, and real estate of the decedent? Such an execution would not be sustained by either the terms or the spirit of the law. The decedent is not the defendant, and the estate of none but the defendant is made liable.
*There is the same difficulty in proceeding under the seventh section. If no goods be found, the officer is directed to indorse nulla bona, and levy “ on the lands, tenements, and real estate of the defendant, of which the said defendant was seized," at or after the judgment. The executor never was seized of the real estate of the decedent. He can not, any more than the decedent, be made to unite in himself the double character of defendant to the judgment, and the part seized of the estate. It is for such a case, and for none other, that provision seems to be made. The terms of the law, in connection with the forms of proceeding, exclude the interpretation that it was intended to authorize the sale of a decedent’s real estate, upon an execution against his personal representative; for all that is here said of an executor applies with equal force to an administrator. This conclusion might be justified by other arguments drawn from the inconvenience in settling the estate of a decedent, the confusion that would be introduced into the forms of business, and the mischiefs likely to result to the heir. But it is not now deemed necessary to do so.
The next inquiry is as to the practice of the courts, and course- *449 of decisions upon this subject. It is alleged that, from the adoption of the law subjecting real, estate to the payment of debts, from the Pennsylvania code, in August, 1795, the practice prevailed of selling a decedent’s lands upon judgment and execution against his personal representative. That this practice has acquired the sanction of law, and that the act of 1805 is substantially the same in its provisions, and consequently subject to the same construction.
We recognize, to its full extent, the doctrine that where the law has been declared by an uninterrupted current of decisions, it is not to be disturbed or unsettled, so as to break up the foundations of titles acquired under them. We admit, too, that a rule of property should be preserved, which rests upon a long and an inveterate course of practice, although apparently founded in no sound reason whatever. But it does not follow, from these admissions, that the practice of attorneys, clerks, and sheriffs, in one section of a state, subject everywhere to the same laws, and a practice of some dozen years continuance, is to be regarded as law in the particular section where it prevailed. It is very certain *that, in some few instances, the real estates of decedents were sold upon judgments against executors or administrators, during the territorial government, and at some times and in some places since. There is no proof before us that this practice ever received the sanction of the territorial or state courts where it prevailed. If the question were raised and decided, some notice of it could be found upon the minutes of the courts, no matter how loosely kept. And those who seek to make it a rule of property on this ground, surely ought to produce some evidence of what they allege. If nothing more can be said than that it passed sub silentio, it has no claims to favor on the ground of decisions. The Supreme Court of the United States, in Telfair v. Stead’s ex’r, 2 Crunch, 418, proceed expressly upon the evidence-they had received, of the construction given by the courts of Georgia to the English statute. And this is the principle of all decisions, from the earliest times to the present. It is not enough that the question passed unnoticed, it must have been decided. A construction must be given by the courts themselves. So it was in Keen v. Delaney, 5 Cranch, 32. The judges of the Supreme Court had taken acknowledgments of deeds for almost a century,, when the power to do so was first questioned. The chief justice *450 there says: “ The court can not doubt that the courts of Pennsylvania consider a justice of the Supreme Court within the act.” Here we doubt about the decisions or the practice, with the approbation of the courts, which are alleged, and no proof is offered excejat the fact of the sales; that is, the irregular practice itself is adduced to sanction itself. Besides, a partial course of decision or of practice, known only to some of the courts, and in some parts of the country, and of no longer existence than ten or fourteen years, has never yet been esteemed as fixing a rule which should be sustained against the plain letter of the law.
But another argument of construction is urged, The law of 1795 was adopted from the Pennsylvania code, and the courts of that state have adjudicated that under it the lands of a decedent may be sold on execdtion, upon a judgment against the personal representative. With the law, it is insisted, we have adopted the construction of the Pennsylvania courts.
*When a statute has been for a time in force, and certain terms used in it are of ambiguous import, to which a fixed and settled construction has been given, it is rational to conclude that •a legislature acquainted with the interpretation they had received when they employ the same terms, intended to adopt their received interpretation. This is a rule of construction resorted to ■for the purpose of ascertaining the intention and meaning of the legislature. To give any force to this rule, the'Terms to be interpreted must be of doubtful import, and the legislature emplojnng •them must be shown to have understood distinctly what was their ■settled interpretation. In the case before us neither of these facts exist. There is nothing in the terms of the Pennsylvania law which indicates an intention of the enacting power that the lands of a decedent should be sold on judgments and executions against his personal representative in all places where the personal goods -were insufficient, or without reference to that fact. It is true, as shall be hereafter shown, there are provisions in that law which •might naturally lead to an interpretation of it very different from ■that of our territorial or state enactments; but still there is no ambiguity of expression. There is no reason to warrant the inference that the Pennsylvania interpretation was known to the governor and judges. To be sure, the governor was a citizen of that state, but he was not a lawyer, and was not particularly conversant with the municipal jurisprudence of the state. The judges *451 were natives of other states, whose vocations had never led them to become particularly acquainted with the laws of Pennsylvania. It seems to bo straining too much to receive the interpretation of the Pennsylvania courts upon this ground.
Again, where a practice has grown up under a statute in a particular and sovereign jurisdiction, it is no just inference that, if another sovereign jurisdiction ingx-aft the same statute into their code, they intended to ingraft, also, into their practice, the practice founded upon it, in the jurisdiction from whence it was taken. The provisions of the statute may be well adapted to the institutions of the government adopting it. The practice founded upon it may be adverse to these institutions ; and those facts must enter into the determination whether the construction is to be ^adopted or not. This rests upon the decisions of courts, and can not be deduced from the mere fact of enacting the statute. Had the question arisen whilst the Pennsylvania statute was in operation, had it been submitted to the general court, and had they decided that with the statute we had adopted the practice under it, we would not now feel at liberty to say that the practice waB not adopted. But the mere fact of making such sales, unaccompanied with any proofs that the courts acted upon them, other than that of total silence, does not place the question upon this -ground.
It is ux’ged in argument that the statute of Pennsylvania, and those of the territorial legislature of 1802 and of the state legislature of 1805, are in terms substantially the samé. We do not think so.
An analysis of the act of 1805, so far as relates to this subject, has already been given. The first five sections are almost a literal transcript of the territorial act of 1802. The exposition made of the pi’ovisions of those sections, when compared with the Pennsylvania law, shows that a very different system was contemplated. The first difference is, that the Pennsylvania law is, obviously, in the nature of a supplement, providing for subjecting real estate where “ no sufficient personal estate can be found.” The laws enacted hoi’e contemplate an entire system, providing for all cases of sales upon execution. Hence, the provisions in detail, which emphatically confino the executions to operate upon .the property of the defendant in such manner as to exclude 'all possibility of touching the lands of decedents upon a judgment against the exe *452 eutor or administrator. Without, however, dwelling upon these, there is one essent'al variance between the two enactments that, in our opinion, subverts completely the position that they are substantially the same.
After declaring that for want of personal goods, real estate should be subject to the payment of debts, and providing for the extent in cases where the rents would pay the debt in seven years, the Pennsylvania law directs, “ that if the clear profits of such lands or tenements shall not be found, by inquest of twelve men, to be sufficient within seven years to satisfy the debt or damages in such executions, or if, before the extent be out, any other debts or damages shall be recovered against the same debtor or defeudant, his heirs, *executors, or administrators, which, with what remains due upon such extent, can not be satisfied out of the yearly profits of the lands or tenements so extended, within seven years; then, and in every such case, the sheriff or other officer shall, accordingly, certify the same upon the return of such executions, whereupon a writ or writs of venditioni exponas shall issue forth, to sell such lands and tenements for and toward satisfaction of what shall remain due upon such extent; as also toward satisfaction of all the rest of said debts or damages, in manner as is hereinafter directed concerning the sale of other lands.
This law, which passed in 1704, is understood to have been substituted for a law passed four years preceding, which subjected “ all lands of debtors to sale, on judgments against their heirs, executors, or administrators.” Under the first law no doubt could be entertained that the lands of a decedent could be sold on execution against his personal representative. It became the duty of the courts to frame their judgments and executions so as to cai’ry the law into effect. The form of the judgment, of course, would be that the plaintiff recover his debt, to be levied of the goods and chattels unadministered, and for want of such goods and chattels of the real estate of which the dec edent died seized. The writ of execution would conform to the judgment. Both would be founded upon the law, and clearly sustainable upon principle.
• The law before us omits this provision, and in the first instance gives no substitute. But it nevertheless contains provision for selling the decedent’s estate on a judgment against his executor or administrators, in cases where the rents are not sufficient to pay the debts in seven years.
Note by the Keboktek. — Nor the purpose of ascertaining, as far as practicable, the extent of the practice, alleged to have existed in the first stages of the government, of selling the lands of a decedent on judgments against executors or administrators, I have carefully examined the records preserved in the clerk’s office of Hamilton county. All that remains of the records of the old general court is here preserved. The writs, pleadings, and executions may principally be found. There is also a volume made up of dockets of original writs, cases for trial, and very meager minutes of the business transacted. There is no record made of any of the proceedings.
After an attentive perusal of this volume of dockets and minutes, I can find only ten judgments rendered against executors or administrators, from .the commencement to the termination of the court. During this period, it sat at Cincinnati, Vincennes, Marietta, and Detroit. I can find no vestige of any motion or decision in respect to an execution against executors or administrators. None in any case, except one concerning the distribution of money. Nor do I find, on examining the executions themselves, any indication that questions had arisen upon them respecting the propriety of levying upon the lands of a testator or intestate, upon judgments against the executor or administrator.
*453 The first proposition of the law is, there shall only be a sale where the rents for seven years are not sufficient to liquidate the debts. If they be found insufficient, or if, after the extent, other judgments be rendered against the debtor, “ his heirs, executors, or administrators,” which, with what is due on the extent, can not be satisfied out of the rents in seven years, upon a return of these facts on execution, a vendi. shall issue to sell, upon account of the whole. Here is an express provision for selling the decedent’s real estate upon judgments against his personal representative. And *when this provision is combined with that of the law of 1700, there is no difficulty in accounting for the Pennsylvania practice. But our statutes of 1802 and 1805 contain no similar provision; and even if the construction contended for, had been given to the Pennsylvania law, it must have been abrogated by the territorial law of 1802.
It is admitted in argument that the practice of selling the real estate of the decedent, upon judgments against his personal representative, is without any analogy to support it in the common law. It is admitted that it stands, at best, upon a doubtful construction. The dissenting opinion, referred to by the defendant’s counsel, contends for nothing more. It is admitted the practice was of only a few years’ duration, and confined to a portion only of the territory of the state. With these admissions before us, and with the clear view we entertain that the construction is not tenable upon any safe or sound principle, we can not consent to recognize its obligation. We consider that the judgment and execution conferred upon the officer no power to sell the lands in question. Consequently, his acts could not divest the devisees of their estate under the will. Judgment must accordingly be for the plaintiff.
The judgments exist in the briefest possible notes. Thus, in the case of Taliaferro v. P. Porter, Administrator of George Porter, out of which the *case of Porter and McArthur, 1 Ohio, 99, arose, the following is all that the minutes present:
“ Nicholas Taliaferro "J v. v Peter Porter, Administrator of George Porter, deceased. J
In Debt.
Judgment, etc.
Debt.............................................................................$933 33
Interest......................................................................... 102 66
Costs.........................................................,.................... 18 61
$1,054 60”
In some of the earlier cases, the judgment against the personal representative contains, in addition to the abbreviation “judgt.,” these words: “of the goods to be administered.” The executions, in some cases, issued direct against the executor or administrator, in some the exigent was to make the money of the goods and chattels of-the deceased, and, for want thereof, of his lands. The minutes and papers contain nothing to evidence any permanent and established practice. On the contrary, they exhibit a mass of confusion, as perplexing as can anywhere be found.
I have also carefully looked over the records of the court of common pleas, from its earliest organization in the county up to August term, 180G. These are comprised in six large folio volumes, containing not all, but the principal of the judgments rendered. Some, confessed without process or pleadings, are not included in it. During this whole period of time, I have found but seventeen judgments recorded as rendered against executors or administrators. Two of these were rendered before August, 1775; six of them after the commencement of 1805.
The earliest judgments are rendered against the executor or administrator personally, and were so entered up to November term, 1795. Prom that period to January term, 1805, the judgments are all technically correct, “to be levied of the goods and chattels of the decedent, in the hands of the representative to he administered.” No judgment is rendered to subject the lands of the deceased. At November term, 1797, in the case of Abbot v. Manning, administrator, the regular judgment was entered, and, upon return of no goods to levy, a sai. fa. was issued against the administrator, to charge him for a devastavit, and, at August, 1798, a technical judgment was rendered against him de bonis propriis. At January term, 1805, upon a scire facias against executors to revive a judgment rendered in the lifetime of the testator, judgment is entered that the plaintiff have execution direct against the executors, as if they were original defendants in their own rights, and such seems to have been the form of the judgments for several succeeding years.
In the case of Kitchell v. Executors of Kitchell, in which the land in controversy between Giay and Askew was sold, judgment was entered August, 1806. The following is an exact transcript of all that is to be found in the clerk’s office concerning- it, except the execution:
M. Brown and Pearsy Kitchell, Executors, etc. “ Calvin Kitchell, Esq.,
“Service acknowledged, amicable suit. I acknowledge judgment for the amount of the notes and interest, to wit: $411.42; costs taxed, $8.48.
“Manassah Bkown.”
“Fi. fa. et lev. fa. issued.”
*The execution runs, that "of the goods and chattels of Luther Kitchell, [485 deceased, in your bailiwick, you cause to be made $411.42, which Galvin Kitchell lately recovered, etc., against M. Brown and P. Kitchell, executors of said Luther, with $8.48 costs, etc., whereof the said executors are convicted, if so much goods and chattels of said executors can he found, and if not, then that you cause the same to be made of the lands and tenements of the said executors.”
This judgment and execution are but common specimens of the loose manner in which the proceedings of these courts were conducted. I add one other, upon account of its peculiar character.
The executors of Isaac Pelty, deceased, at February term, 1801, commenced an action, in their character of executors, against John Orhison. At August term, 1801, the cause was discontinued for want of prosecution. Afterward, to October term, -1804, Orhison sued a writ of sci. fa. against the executors, to appear and show cause why execution should not he awarded against them for the costs. No cause being shown, the following judgment was entered:
“ Therefore, it is considered by the court that the said John Orhison do recover against the said Thomas and Mary, executors, etc., their original costs, to twenty-eight dollars and twenty cents, and also fourteen dollars and twenty cents for his damages, as well by reason of the detention of said costs, as for his costs and charges by him about his suit in this behalf expended, and he have execution thereof, etc.”
Upon this judgment execution issued, reciting and commanding as follows: “That of the goods and chattels of Thomas Gibson and Mary Dupriest, executors of Isaac Felty, deceased, in your bailiwick, you cause to be made forty-two dollars and eighty-seven cents, which John Orhison recovered, etc., whoreof the said Thomas and Mary are convicted, as appears to us of record. Therefore, it is considered that the said John have his execution against the said Thomas and Mary, executors aforesaid, in so much goods and chattels of the said Thomas and Mary, executors aforesaid, as can be found, etc., and if not. then that you cause the same to be made of the lands and tenements of the said Thomas and Mary, executors aforesaid, etc.”
This execution was levied upon a part of the real estate of the testator, Pelty, in virtue of which it was sold and lost to the heirs. No principle of any known law could be thought of to authorize a sale of lands to pay costs created by the executors. Tet, long after the Pennsylvania law had ceased to have effect in Ohio, this sale, unauthorized by it, or by any existing law, was effected.
The facts here stated are collected and published, that the bench and the bar in other parts of the state may he the better enabled to understand the extent, nature, and character of a practice which has been much talked of as having settled a rule of law obligatory upon the courts.