*22 Vroom.*                    Fritts v. Kuhl.

STATE, EX REL. GEORGE FRITTS, v. RICHARD S. KUHL.

The constitution of this state provides that "when a vacancy happens during the recess of the legislature in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy, and the commission shall expire at the end of the next session of the legislature, unless a successor shall be sooner appointed." *Held,* that under this clause the governor may, in the recess, make an appointment to fill the office temporarily, where the vacancy first began during the session of the legislature.

*Quo warranto.*

Argued at November Term, 1888, before BEASLEY, CHIEF JUSTICE, and Justices VAN SYCKEL, KNAPP and GARRISON.

For the relator, *Riker & Riker* and *Voorhees & Cotter.*

For the defendant, *W. S. Gummere, Henry Young* and *John P. Stockton, Attorney General.*

The opinion of the court was delivered by

VAN SYCKEL, J.   The facts which have occasioned this litigation are as follows:

On the 15th of February, 1888, a vacancy occurred in the office of president judge of the Hunterdon Pleas by the death of Mr. Sanderson.   At the time of his death the senate was in session, and remained in session until the 30th day of March, 1888.

On the 1st day of March, 1888, the governor nominated the defendant, Richard S. Kuhl, to the office of president judge of the Hunterdon Pleas, to fill the said vacancy.   The senate held the nomination until the 20th of March, and then refused to consent to it.   No other nomination to this office was made by the governor to the senate during its session. In the meantime the chief justice, under a statute passed in February, 1888, appointed Judge Bartine, of the Somerset

Pleas, to preside in Hunterdon and perform the duties of president judge of Hunterdon Pleas. On the 7th of April, 1888, during the recess of the legislature, and while Judge Bartine was presiding in Hunterdon, the governor appointed the defendant to fill the vacancy occasioned by the death of Judge Sanderson.

The information is filed to determine whether the governor had the power, during the recess of the legislature, to fill a vacancy such as existed in this case.

Paragraph 1, section 2, article 7, of our constitution provides as follows: "Justices of the Supreme Court, chancellor, judges of the Court of Errors and Appeals, and judges of the Inferior Court of Common Pleas, shall be nominated by the governor and appointed by him, with the advice and consent of the senate."

Paragraph 12, of article 5, provides that "when a vacancy happens during the recess of the legislature in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy, and the commission shall expire at the end of the next session of the legislature, unless a successor shall be sooner appointed."

If, therefore, within the meaning of this paragraph of the state constitution "this vacancy happened during the recess of the legislature," it was the duty of the governor to fill it. The word "happen," in its strictest literal sense, signifies an unexpected event. It is also not uncommonly used as synonymous with "occur," "take place," "exist" and "happens to be." In its most rigorous meaning, if the contingency implied by it is referred strictly to the time of the occurrence of the vacancy, it will exclude the power of the governor to appoint where an official term expires by its own limitation in the recess, for in that there is nothing uncertain, the time is fixed and definite. On the contrary, it may be said that while there is no uncertainty as to the point of time, when the vacancy will occur in such a case, there is uncertainty, whether the senate will be in session, and therefore a word implying an unexpected event is properly used. It may also be argued

that if the uncertainty implied by the word " happens " is as to the senate being in session, the vacancy does not happen then, the time of that is certain, but the senate happens not to be in session, and that the constitutional clause should be read as follows : " When it happens that the senate is not in session when there is a vacancy." This would give the governor power to appoint in all cases of vacancy. These suggestions are made to show that the import of this clause is not free from doubt.

In order, therefore, to ascertain its true meaning, in accordance with the recognized rules of interpretation, we must seek for the reason and spirit of it, having regard to the effects and consequences of the construction adopted, and the source from which the language employed was derived. Was it intended merely to prevent those offices from remaining vacant, which became so during the recess of the legislature by some casualty, or was it to prevent any of the enumerated offices from remaining vacant during the recess of the senate, without regard to when or how the vacancy occurred ?

The latter clause of section 2, article 2, of the federal constitution, adopted in 1787, provides that " the president shall have power to fill up all vacancies that may happen during the recess of the senate, by granting commissions which shall expire at the end of their next session."

The same section provides that the president shall nominate, and by and with the advice and consent of the senate, shall appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States whose appointments are not otherwise provided for.

The executive journals show that President Washington sometimes met the senate in executive session to seek their advice and consent. *Senate Journal,* No. 2, *p.* 16 ; *Executive Journal,* August 22d, 1789 ; *Executive Journal,* August 24th, 1789.

There is no record of the senate having considered "nominations" in his presence, but that it was his privilege to be in attendance when his nominations were being considered

is clearly shown by Senate Rule 36, in regard to executive sessions.

From this fact the inference may fairly be drawn that it was not at that early day supposed that the senate could, in the just exercise of its power, arbitrarily and without assigning reasonable cause, reject the president's nominations. Such conduct by the senate, in his presence, would have been discourteous and offensive, and a virtual usurpation of the right to nominate.

During the administration of President Monroe, in 1823, the question arose whether he had the power to fill, during the recess of the senate, a vacancy which had begun during the preceding session of the senate. During that session the president had made a nomination which the senate refused to confirm, and then adjourned, leaving the office unfilled.

Mr. Wirt, then attorney general, advised the president that he had power to fill the vacancy. In his opinion, he says:

"Had this vacancy first occurred during the recess of the senate, no doubt would have arisen as to the president's power to fill it. The doubt arises from the circumstance of its having first occurred during the session of the senate. But the expression used by the constitution is 'happen.' 'All vacancies that may happen during the recess of the senate.' The most natural sense of this term is, 'to chance—to fall out—to take place by accident.' But the expression seems not perfectly clear. It may mean, 'happen to take place;' this is 'to originate;' under which sense the president would not have the power to fill the vacancy. It may, also, without violence to the sense, mean 'happen to exist,' under which sense the president would have the right to fill it by his temporary commission. Which of these two senses is to be preferred?

"The first seems to be most accordant with the letter of the constitution; the second most accordant with its reason and spirit. The meaning of the constitution seems to me to result in this: that the president alone cannot make a permanent appointment to those offices; that to render the appointment permanent, it must receive the consent of the senate; but that,

whensoever a vacancy shall exist which the public interests require to be immediately filled, and in filling which the advice and consent of the senate cannot be immediately asked, because of the recess, the president shall have the power of filling it by an appointment to continue only until the senate shall have passed upon it; or, in the language of the constitution, till the end of the next session.　*　*　*　In reason, it seems to me perfectly immaterial when the vacancy first arose; for, whether it arose during the session of the senate, or during their recess, it equally requires to be filled.　The constitution does not look to the moment of the origin of the vacancy, but to the state of things at the point of time at which the president is called on to act."

In 1825, Mr. President Adams adopted this construction of the constitution in the appointment of Amos Binney as navy agent of the port of Boston.

During the administration of President Jackson, in 1832, Attorney General Taney gave an opinion in which he accepted the interpretation of his predecessor, and held that the meaning of this clause of the constitution is, " if there happen to be any vacancies during the recess."　To enforce his views, he states instances in which it cannot be imagined that the power to fill the vacancy was intended to be withheld from the president.

An officer may die abroad or in a distant part of the country, and his death not be known until after adjournment, or a nomination may be confirmed by the senate, and the appointee may refuse to accept after adjournment.

In 1841, Mr. Legaré, attorney general, expressed a like opinion (*vol.* 3, *p.* 673), which was concurred in by Mr. Attorney General Mason, in 1846.　*Vol.* 4 *of Opinions, p.* 523.

In 1855, Attorney General Cushing, referring to the opinions of his predecessors in office, says:

"They have thoroughly demonstrated and conclusively established, as a doctrine of administrative law, that the expression of the constitution, ' all vacancies that may happen,' signifies ' all vacancies that may happen to exist in the recess,' or ' when

there happen to be any vacancies in the recess.' And they concur in the general statement, that howsoever a vacancy happens to exist, if it exist it may be filled by temporary appointment of the president. They all agree that it is the true spirit of the constitution to have the offices, which congress indicates to be needful by creating them, filled, though provisionally, rather than remain vacant or force a special call of the senate." *Vol. 7 of Opinions, p.* 187.

To the same effect are the opinions of Attorney General Bates, in 1862, and Attorney General Speed, in 1865.

Mr. Attorney General Stanbery, in 1866, gave a very elaborate opinion, the conclusion of which was that the president has full and independent power to fill vacancies in the recess of the senate, without any limitation as to the time when they first occurred. *Vol. 12 of Opinions, p.* 32.

Mr. Evarts, when attorney general, in 1868, in a carefully prepared opinion, reached the conclusion that a vacancy occurring while the senate was in session, and continuing, through the failure of the senate to confirm a successor, could be filled by the president during the recess of the senate. *Vol. 12 of Opinions, p.* 449.

In 1868, Judge Cadwalader, of the United States District Court of Pennsylvania, dissented from these views. *Dist. Atty. Case,* 7 *Am. L. Reg.* 786.

Ten years later, Justice Woods, of the United States Supreme Court, sitting in the Georgia Circuit, refused to concur in the opinion of Judge Cadwalader. *Farrow's Case,* 3 *Fed. Rep.* 112.

And Attorney General Devens, in 1880, after an elaborate discussion of the subject, concluded that the opinions of his predecessors, and the practice under them, had settled the construction of the constitution, that appointments might rightly be made though the vacancy first began during the session of the senate, and he declared that the contrary view of Judge Cadwalader could not be considered of great authority or weight against these opinions, and an administrative usage which commenced as early as the time of President Monroe,

and in reference to which such usage has been invariable.    *Vol.* 16 *of Opinions, p.* 522.

All these opinions are based upon the idea that the power involves the performance of a duty, intended for the public good, and necessary for the effective administration of the government, and they discard the notion that the point of time at which the vacancy occurs has anything to do with the power of the president to make a provisional appointment.

A letter written by Madison to President Monroe, May 16th, 1822, shows that the appointment of a navy agent in 1823, by President Monroe, under the advice of Attorney General Wirt, was not the first instance in which such power was exercised by the national executive. Mr. Madison says:

"Although my memory cannot refer to any particular appointments to original vacancies in the recess of the senate, I am confident that such have taken place, under a pressure of circumstances, where no legal provision had authorized them. There have been cases where offices were created by congress, and appointments to them made with the sanction of the senate, which were, notwithstanding, found to be vacant in consequence of refusals to accept them, or of unknown death of the party at the time of the appointment, and thence filled by the president alone. These were, however, cases of necessity. Whether others not having that basis have occurred, my present recollections do not enable me to say." *Madison's Works, vol.* 3, *p.* 269.

The appointments of which the writer speaks were manifestly made prior to his own official term, during the administration either of Jefferson, the elder Adams or Washington, his only predecessors.

The first constitution of this state contained no express provision for filling vacancies in state offices, which might exist during the recess of the legislature. In 1802, in *State* v. *Parkhurst,* 4 *Halst.* 528, the question was submitted to this court, whether an appointment to the office of clerk of Essex county, made by Governor Bloomfield during the recess of

the legislature, to fill a vacancy which existed in that office, was a constitutional exercise of his power?

The constitution provided that the office of county clerk should be filled by the legislature in joint meeting, and the Supreme Court therefore denied the power of the executive. Chief Justice Kirkpatrick dissented, on the ground that by the eighth section of the constitution the governor was vested with the supreme executive power, and was thereby charged with the duty of filling all such vacancies during the recess of the legislature. In this dissenting opinion the Court of Errors afterwards unanimously concurred. 4 *Halst.* 537, *note.*

Thus it appears that when the framers of our constitution of 1844 were assembled to consider the question of providing for the temporary filling, during the recess of the senate, of vacancies existing in those offices which were to be permanently filled by the governor, with the advice and consent of the senate, or by the legislature in joint meeting, they had in view the fact that the power had been denied, and they wisely made express provision for it in the fundamental law.

That they carefully considered the language which should be used in incorporating into the new constitution an express provision for the temporary filling of vacancies in state offices during the recess of the legislature, cannot be doubted! Instead of attempting to formulate for themselves a clause which would express their purpose, they prudently adopted the language of that clause of the federal constitution which authorizes the president to fill vacancies which happen during the recess of the senate.

That the body which framed the constitution of 1844 was ignorant of the interpretation of this language, which had uniformly prevailed in the practice of the federal government, at least since the term of the elder Adams, cannot be conceded, when we remember that among the members present in that convention, and actively participating in its work, were Joseph C. Hornblower, Henry W. Green, Peter D. Vroom, Alexander Wurts, Abraham Browning, and other eminent jurists of our state.

Mahlon Dickerson, James Parker, Ferdinand S. Schenck, Joseph F. Randolph and Charles C. Stratton were also members of the convention of 1844.

Mr. Dickerson was a member of the United States Senate from 1817 to 1833, and, it seems, must have been conversant with the fact that, in 1823, Mr. Attorney General Wirt gave to President Monroe, and, in 1832, Mr. Attorney General Taney gave to President Jackson, the opinions to which reference has been made.

Mr. Parker, Mr. Schenck, Mr. Randolph, Mr. Stratton and Mr. Vroom were members of the Federal House of Representatives between 1833 and 1843, and must have been familiar with events so important in the political history of the period of their public service. That, in a convention in which these distinguished men exercised a controlling influence, a clause should have been incorporated in our state constitution with the intention that it should receive an interpretation different from that which we may reasonably assume they knew had been applied to it in the unvarying practice of the federal government for nearly half a century, is scarcely conceivable.

The question, therefore, which confronts us is far different from that submitted to Attorney General Wirt and that passed upon by Judge Cadwalader.

The rule is well settled that where a statute or a constitutional provision of doubtful import has been adopted in one state from the statutes or constitution of another state, after a practical construction has been given to the language by judicial decision, it will be presumed that the interpretation adopted in the state from which it is taken has been accepted as well as the words. *Lessee of Gray* v. *Askew,* 3 *Ohio* 466 ; *Langdon* v. *Applegate,* 5 *Ind.* 327 ; *Rigg* v. *Wilton,* 13 *Ill.* 15 ; *Adams* v. *Field,* 21 *Vt.* 256 ; *Rutland* v. *Mendon,* 1 *Pick.* 154.

It is a safe rule of construction that when the convention, in framing the organic law of the state, thought proper to borrow provisions from the constitutions of other states, which provisions had already received a judicial construction, they

adopted them in view of such construction and acquiesced in its correctness.  *People* v. *Coleman*, 4 *Cal.* 48.

In 1844, there had been no judicial exposition of this language of the federal constitution, but the reason which underlies the decisions in the cases cited make them applicable to the case before us.

In *State* v. *Kelsey*, 15 *Vroom* 1, this court declared that "a statute of uncertain meaning, which has been enforced in a certain sense for a long series of years by the different departments of government, will be judicially construed in that sense." This rule has been held to apply, with equal reason, in expounding the constitution.  *Briscoe* v. *Bank*, 11 *Pet.* 257, 318; *Moers* v. *Reading*, 21 *Penna. St.* 188.

Not only has this language acquired, by long established usage, a well settled meaning in the exercise by the president of his functions under the federal constitution, but it has received a like interpretation in the conduct of our state government since 1875, without challenge, until this information was filed.

Governor Haines, in 1850, appointed Thomas S. Allison secretary of state, after the senate had failed to confirm him, and after the legislature had adjourned, and at the same time appointed Jacob Van Arsdale clerk in chancery, under like circumstances, but in both these instances the term of the predecessor did not expire until after the recess—that of Allison, November 10th, 1850, and that of Van Arsdale, November 17th, 1850. Governor Bedle, on several occasions, after the legislature adjourned, filled vacancies which had occurred during the session.

Governors McClellan, Ludlow and Abbett exercised the same power, and the official opinions of Attorneys General Vanatta and Stockton show that it was done after a careful consideration of the subject.

The only cases in which it appears that the executive has refused to exercise this power, is that of Governor Newell and Governor Olden. The former, in 1859, refused to fill the vacancy caused by the expiration of the term of Chancellor

Williamson. Governor Olden also refused, in the following year, to fill the vacancy existing in the office of chief justice by the refusal of the senate to confirm Mr. Whelpley. What influenced their action in this respect is not known; so far as appears, no official opinion was expressed by Governor Newell's distinguished attorney general, the late Hon. William L. Dayton.

Mr. Story, in his Commentaries on the Constitution, section 408, says: " The most unexceptionable source of collateral interpretation is from the practical exposition of the government itself in its various departments upon particular questions discussed and settled upon their own single merits."

Mr. Cooley expresses a like view in the following language: " When there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction present themselves to the courts with a plausibility and force which it is not easy to resist."

This principle was acted upon by the Supreme Court of the United States in *Stewart* v. *Laird,* 1 *Cranch* 299, where that court sustained the authority of its members to sit as circuit judges, on the ground of a practical construction commencing with the organization of the government.

The relator has referred to the proceedings of the constitutional convention of 1844 to establish his position. Though this is not admitted to be a legitimate aid to interpretation, an examination will show that they furnish no support to his case.

On page 137 of the Journal, it appears that Mr. Wood offered the following section: " To guard the people against the inconveniences which may arise from vacancies not filled by reason of the non-concurrence of the senate in the nomination of the governor within ten days after the first nomination is sent in, the office shall be filled by the senate and general assembly." This was not agreed to, but it shows that the fact of a disagreement between the governor and the senate was considered by the convention, and that the convention

was unwilling, in that contingency, to deprive the governor of the power to fill the vacancy.

On page 175, Mr. Pitney made the following report:

" When a vacancy happens in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy, and grant commissions to expire at the end of the next session of the legislature."

This would have given the governor power, when the vacancy occurred during the legislative session, to fill the vacancy during the session, without the advice of the senate, and to grant a commission to expire at the end of the next session of the legislature.

It was doubtless in that view that Mr. Ryerson (page 176) moved to amend by inserting after " happens " the words " during the recess of the legislature;" and Mr. Randolph moved to add, after " legislature," " unless a successor shall be sooner appointed," in order that the successor might take possession of the office as soon as he received his commission.

But it is insisted that if all the vacancies that existed were to be filled by the governor during the recess, the amendment of Mr. Ryerson would have been inserted after the word " shall," so as to make the clause read : " When a vacancy happens in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall, during the recess of the legislature, fill such vacancy, and grant commissions to expire at the end of the next session of the legislature."

The literal reading of the clause in that form would be, that whether the vacancy occurred during the sitting of the legislature or during the recess, the governor would have the power to fill, and that in case the vacancy occurred during the session, it could not be filled until after the adjournment. The construction which such language would have received, if it had been adopted, is not of importance now ; the fact that it does not clearly express the meaning which the relator

imputes to it sufficiently answers the argument based upon this suggestion.

Article 5 of our state constitution provides that the executive power shall be vested in the governor, and that he shall take care that the laws be faithfully executed.

Without detriment to the public, there are times when the legislature is not in session to pass laws, and the courts not in session to interpret and administer them, but it is absolutely necessary that the executive power shall always be capable of exercise. There is no point of time when the governor may not be called upon to enforce the laws, and there should be no time when he is incapable of acting. He cannot exercise all the executive power himself; he must act through the agency of others. He cannot hold the courts or perform the duties required of his appointees. When, therefore, we reflect that the constitution has most carefully guarded against a vacancy in the office of governor, and vested in him alone the power to appoint certain officers to perform the most essential functions of government, and that upon him alone the duty is imposed to see that the laws are faithfully executed, we must be persuaded that the power conferred was intended to be commensurate with the duty required. It repels the idea that there is to be an interval of time, no matter how great the public exigency, or how much the public interest might suffer, when the executive power is dormant, and unable to act through the only agency recognized in the constitution, and during which the execution of the laws is in a measure suspended.

The inference is very strong that expression will be given to the intention of the framers of the constitution by adopting the construction which will leave the power of the chief executive unbroken, and maintain in constant activity all the machinery provided for and essential to the conduct of the government in its regular and orderly course. Our system of government is, *pro tanto*, a failure, if the execution of the most important functions of government may be indefinitely arrested by the disagreement of two of its co-ordinate branches. To

avoid a result equally contrary to reason, led to the adoption of Chief Justice Kirkpatrick's views, in State *v.* Parkhurst.

The exigencies of the public service were no greater under the old constitution than they have repeatedly proven to be under the new constitution. Under the constitution of 1844, the chancellor and justices of the Supreme Court hold their offices for seven years; the attorney general, prosecutors of the pleas, clerk of the Supreme Court, clerk in chancery and secretary of state, hold for five years. In neither case is provision made that they shall hold until a successor is appointed. The disastrous consequences which would flow from a long continued vacancy in these offices need not be enlarged upon. A system which provided no remedy for such an emergency would be conspicuously defective, and could not have received the approbation of the experienced men who framed our constitution. The history of the federal government had shown frequent disagreement between the president and federal senate, and the convention could not have supposed that the experience of our state government would be different.

We must confidently look, therefore, for some provision to meet an exigency which, I have shown, must have been anticipated and foreseen.

It is a postulate of a state constitution, which distinguishes it from the federal constitution, that all the power of the people is delegated by it, except such parts of it as are specifically reserved.     *Kirby* v. *Shaw,* 19 *Penna. St.* 258; *Wisconsin Railroad* v. *Taylor Co.,* 52 *Wis.* 37, 86.

The power to fill the vacancy in question is not reserved in the constitution to the people themselves. It does not inhere in the courts, and cannot be exercised by the legislature when not in session. If it resides anywhere, it must be in the chief executive department of the government. We are impelled to the conclusion that the convention intended to lodge it there by the use of language which had been repeatedly declared to have that effect. This inference cannot be resisted in the absence of any language to exclude such intention, and in

view of the failure of the convention to make any other provision for such a conjuncture.

The fact that care was used to provide against possible vacancies in office, is evinced by the language in the constitution immediately following that which is the subject of this controversy. It provides that when a vacancy happens in the office of clerk or surrogate of any county (officers elected by the people), the governor shall fill such vacancy, and the commission shall expire when a successor is elected and qualified. It cannot reasonably be presumed that the convention, having carefully provided to keep these offices filled in every contingency, would have left the more important positions unguarded. If unwilling to commit to the executive the right to fill, temporarily, in the event of disagreement with the senate, the convention would have bestowed the power elsewhere.

That sense of the word " happens," we think, must be preferred which will enable the governor to execute the laws at all times, and maintain in constant and harmonious employment all the machinery which the organic law has devised for good government.

Chief Justice Parker, in *Henshaw* v. *Foster*, 9 *Pick.* 312, declared that if an enlarged sense of any particular form of expression should be necessary to accomplish so great an object as the convenient exercise of a fundamental right, such sense should be attributed to it, and in that view was led to hold that the words " written votes," in the Massachusetts constitution, included both written and printed votes.

The argument of those who deny the power, that it will tend to deprive the senate of their just participation in appointments to office, is not of controlling force. It is not logical to argue from an abuse of power to a negation of it. Every authority, however indispensable, may be the subject of abuse. Undoubtedly the governor may abuse this, as he may any other power entrusted to him, but the argument is equally cogent, that the senate may arbitrarily refuse to consent to every nomination made by the governor, and leave him

powerless to execute the laws, unless he will accede to its demands. The consequences likely to flow from a denial of the governor's power are much more to be deprecated than those that can result from conceding it.

The power of the governor to appoint, where vacancies happen during the recess, extends not only to those offices filled by the governor with the advice of the senate, but also to those filled by the legislature in joint meeting. The failure to fill the latter during the session can result from no breach of duty on the part of the executive. The power of the governor, after the adjournment, to fill a vacancy, must be the same in both cases; if he cannot appoint in the one case, he cannot in the other; and this shows that it was not intended to put a limitation upon his power to guard against an abuse of his prerogative.

The possibility of abuse loses its significance the moment we distinguish between power and duty. The question of power alone can be considered by this court. For willful breach of official duty, or abuse of the power committed to him, the governor is, like other civil officers, liable to impeachment, and must answer to the tribunal erected under the constitution for the trial of such cases. Even though the governor should be guilty of a breach of duty in refusing to send any nomination at all to the senate, during its session, it would be none the less within his power, and his duty after the adjournment, to fill the vacancy. In that case, the impeachable conduct would be his willful refusal to advise with the senate, and not his act in filling the vacancy in the after recess.

On the 15th of February, 1888, the legislature passed the following act: " That in case of absence, sickness or other inability or vacancy in the office of law or president judge of any county in this state, to sit or perform the duties of his office, it shall be lawful for the chief justice or any associate justice of the Supreme Court, if he shall be unable to perform the duties himself, which he is hereby authorized and required to do, to designate and request the law or president judge of

any other county to preside in the place and stead of any such law or president judge thus absent, sick or unable to sit, and preside in the courts to which he was especially appointed; which said law or president judge so designated and requested shall have all the power and perform all the duties of any such law or president judge thus absent, sick or unable to attend to the duties of his office, upon filing such designation and request in the office of the clerk of the county in the courts of which he shall have been requested so as aforesaid to preside."

Under this act the chief justice appointed Judge Bartine, of the Somerset Pleas, to preside in the Hunterdon court, and under that appointment Judge Bartine was actually presiding when the governor appointed Mr. Kuhl.

It is, therefore, contended, that at the time of Mr. Kuhl's appointment no vacancy existed in the office of president judge of the Hunterdon Pleas. To this there appears to be two sufficient answers, without discussing the constitutionality of the act.

The act provides only for filling the position of a judge who is temporarily absent by reason of sickness or other like disability, and not to an office vacated by the death of the incumbent.

It does not provide for the appointment of a law judge for Hunterdon county, but simply for the discharge of the duties of the office by some other official, to be designated by the chief justice. Judge Bartine no more became the incumbent of the office, by being called upon to perform its duties, than the chief justice himself would have been had he performed them. The office in either case would have remained vacant. If that be not so, when would the office become vacant?

There is no limitation of the tenure of Judge Bartine in the act under which he was appointed, except the termination of the inability or absence of the person in whose stead he was to act; and if the office was not vacant while he was discharging its duties, when would it become vacant so that the governor could fill it, with the advice and consent of the senate?

The making of the appointment in controversy was, in my judgment, a legal exercise by the governor of his constitutional prerogative. The propriety of the appointment of Mr. Kuhl, after his rejection by the senate, was a question for the governor alone. This court has no right to instruct the governor as to matters which involve his duty only and not his power. We cannot know the circumstances which influenced his action, and must presume that he acted rightly.

There should be judgment for the respondent.