## No. 11,329.

### MURPHY v. PEOPLE EX REL. LEHMAN.

Decided November 9, 1925.   Rehearing denied December 14, 1925.

Action in quo warranto over the office of engineer member of the state board of land commissioners.   Judgment for relator.

*Reversed,*

*On Application for Supersedeas.*

1. OFFICES AND OFFICERS—*Vacancy—Constitutional Law.* The expiration of an incumbent's term of office creates a vacancy within the meaning of article 4, section 6, of the Constitution.

2. *Vacancy—Appointment.* Under the provisions of article 4, section 6, of the Constitution, when a vacancy occurs in a state office during a session of the senate, the governor must nominate, and with the consent of the senate appoint a person to fill the office; during a recess, he must appoint to discharge the duties ad interim.

3. WORDS AND PHRASES—*Construction—"Occur."* The word "occur" as used in article 4, section 6 of the Constitution, means arise, begin and not exist.

4. OFFICES AND OFFICERS—*Land Commissioner—Vacancy—Appointment.* The term of office of the engineering member of the state board of land commissioners having expired while the senate was in session and no appointment having been made, and confirmed, before adjournment, it is held that the governor could not make an ad interim appointment, but must await the next session of the senate or call a special session, the incumbent in the meantime holding over.

*Error to the District Court of the City and County of Denver, Hon. Henley A. Calvert, Judge.*

Mr. GRANBY HILLYER, Mr. HORACE N. HAWKINS, Mr. H. L. LUBERS, Mr. DE S. DELAPPE, for plaintiff in error.

Mr. HENRY E. MAY, Mr. ALBERT E. BOGDON, Messrs. CRUMP & RILEY, for defendant in error.

Mr. EDWARD C. STIMSON, Mr. THOMAS H. DEVINE, Mr. CHARLES J. MOYNIHAN, Mr. SAMUEL J. KINSLEY, Mr. DAVID P. STRICKLER, Messrs. LEE & SHAW, amici curiae.

*En banc.*

MR. JUSTICE DENISON delivered the opinion of the court.

LEHMAN brought quo warranto against Murphy and obtained a judgment ousting him and he brings error. By agreement of all parties the case is heard on the briefs on motion for supersedeas.

In March, 1919, Murphy was appointed by the governor with the consent of the senate as civil engineer member of the state board of land commissioners for a term ending January 13, 1925. Colo. Const., Art. IX, sec. § 9. He served until the end of his term and until now. On the 7th of January, 1925, the senate convened and sat continuously till April 16th, when it adjourned. On said 16th day of April the governor sent the relator's name to the senate as his appointee for such office. The nomination was referred to the State Affairs Committee, and on its recommendation was indefinately postponed for lack of time.

April 17th, by executive order, the governor appointed the relator to said office for a term to expire on the second Tuesday in January, 1931. He qualified and demanded the office but respondent refused; hence this action.

Had the governor, under these circumstances, the right to make the interim appointment? We think not.

Colorado Constitution, article IX, section 9, reads as follows: "The state board of land commissioners shall be composed of three persons to be appointed by the governor, with the consent of the senate. * * *."

Article XII, section 1: "Every person holding any civil office under the state or any municipality therein, shall, unless removed according to law, exercise the duties of such office until his successor is duly qualified; * * * ."

Article IV, section 6: "The governor shall nominate, and by and with the consent of the senate, appoint all officers whose offices are established by this Constitution * * * . If during the recess of the senate a vacancy occur in any such office, the governor shall appoint some fit person to discharge the duties thereof until the next meeting of the senate, when he shall nominate some person to fill such office. * * * "

In *Walsh v. People,* 72 Colo. 406, 211 Pac. 646, we held that the expiration of the incumbent's term created a vacancy within the meaning of article IV, section 6, notwithstanding article XII, section 1. The claim of plaintiffs in error, therefore, that the expiration of a term of office does not create such a vacancy as will permit the governor to make a recess appointment under said section 6, cannot stand, though it is supported by powerful authority.

The additional point is made, however, that in order to give the governor such power the vacancy must "occur" during a recess of the senate. Plaintiff in error says "occur" means "arise", "take place." Defendant in error says it means "exist," "be."

In *Walsh v. People, supra,* the expiration of the previous term took place during a recess of the senate, so there was no question there of the meaning of the word "occur"; it seems, therefore, that the only question before us is: What is the sense in which that word is used in said section 6? The word carries to the mind a sense of origin, beginning, not of mere existence nor of continuation. An explosion occurs; a river is. Derivatively, too, this is its meaning (See Webster) ; and although it is sometimes used to carry some idea of existence yet such is not its ordinary and usual sense. One might say a session of congress occurred in 1912, but one would not say so if it began in 1911; likewise when we hear that a vacancy occurred in a recess of the senate our first thought is that it began then, not that the recess began during the vacancy. It is interesting to note that in the various opin-

ions of the courts on this subject, the writers, apparently unconsciously, often use the word occur in the sense of begin but never, we believe, in the sense of exist. Why did not the constitutional convention say "if there shall be a vacancy" instead of "if a vacancy shall occur"?

The New Jersey supreme court (*Fritts v. Kuhl,* 51 N. J. L., 191, 198, 17 Atl. 102) considers the fact that the constitutional convention of that state copied the United States Constitution, an indication that they intended to adopt the construction thereof previously given by the United States Attorneys General, which was that "happen" meant "exist." If that be so, may we not say that the fact that our convention adopted different words indicates a different intention? It cannot be doubted that the able and distinguished lawyers who were members of our convention considered these matters with care and had the national Constitution always in mind.

The original draft of the article pertaining to the executive department which was reported to the Colorado constitutional convention by the committee on that subject contained an almost literal copy of the United States Constitution, article II, section II, paragraph 3, as to filling of vacancies, using the words "vacancies that may happen * * * during a recess of the senate" (Proc. of Const. Conv., p. 74). The committee of the whole changed the words to "in case of a vacancy * * * during a recess of the senate the governor shall make a temporary appointment until the next meeting of the senate when he shall nominate some person to fill such office." p. 128. The convention adopted this report. pp. 216—219. The committee on revisions and adjustments, of which the late Justice of this Court, E. T. Wells, was chairman, reported a substitute (p. 401), which read as does our present Constitution, and in this form it was finally passed by the convention and people. The word, then, vital to the present question, was before the convention in three forms, "happen", "In case of * * * ", which is equivalent to "be" or "exist", and, finally, "occur." Can it be doubted that

the last was chosen because it was supposed to mean something that the others did not? Judge Wells knew what words meant and how to use them, and was not a man to use them carelessly. If the committee wished the governor to fill vacancies which began before, but continued into a recess of the senate, why did not they leave the sentence as the committee of the whole had framed it? Or if they wished to follow the ideas of the United States Attorney General, why did they not go back to the original draft? This argument is not conclusive but seems of much force, and it discounts the New Jersey case, supra, because the words of the New Jersey Constitution were used and then abandoned. *People, ex rel. v. May,* 9 Colo. 80, 97, 98, 10 Pac. 641.

The purpose of the section seems not to be more with Lehman than with Murphy. It was to provide for the continuous discharge of the duties of every office. During session, then, the governor must nominate and with consent appoint to fill the office; during recess he must appoint to discharge the duties ad interim. There are no other times than session and recess; all possible times are thus provided for; the incumbent, if there is one, continues to discharge the duties till the governor acts. So, assuming and expecting that the governor will do his duty and in due time seek the consent of the senate, all possible contingencies are met, * the plan of the defendant in error does not meet them better.

The governor may appoint a man to discharge the duties until the next session of the senate when he shall appoint some one to fill the office if a vacancy exists during the session of the senate.

It cannot be disputed that it is the governor's constitutional duty to nominate to the senate when it is in session and upon their consent appoint to fill every vacant office.

The fact that the governor nominated and the senate

---

* Unless, perhaps, that of a vacancy by death or other unpredictable hap at the very end of a session, leaving no one to exercise the duties, when a special session might be necessary.

failed to consent is, of course, irrelevant if "occur" means "begin."

As to authorities: Defendants in error cite *People v. Osborne*, 7 Colo. 605, but it is not precisely in point. It was decided on the point that there was no vacancy because the statute there in question provided that the *"term of office shall continue"* * * * until the successor is appointed and qualified, whereas here the expression is *exercise the duties of the office until*, etc.; we pointed out this distinction in *Walsh v. People, supra*. It therefore did not control us in *Walsh v. People*. The question now under consideration was not in that case.

They also cite *Fritts v. Kuhl, supra*, and *In re Farrow*, 3 Fed. 112, and various opinions of the United States Attorneys General all of which are strong in their favor. Some of these authorities, however, may be distinguished in that they depended, at least in part, on public necessity, because there was no one, as here there is, to discharge the duties. Their main reliance is *Walsh v. People*, but we have already distinguished that case.

Most of the authorities cited by the plaintiff in error go more particularly to the question of the existence of a vacancy rather than the meaning of the word "occur." Such are *State, ex rel. v. Howe*, 25 Oh. St. 588, 18 Am. Rep. 321; *Dunbar v. Cronin*, 18 Ariz. 583, 164 Pac. 447; *People v. Tilton*, 37 Cal. 614. In the latter case, however, Chief Justice Sawyer said, that it is the design of the Constitution to restrict the appointing power within the narrowest limits, and "If the point is doubtful, this recognized principle should turn the scale against the appointing power where there is a party authorized to perform the duties of the office till it can be filled by the regular appointing power." That statement fits the present case though the case does not, and, upon the principle thus stated and followed, which is stated and followed in numerous cases, we ought to be slow to stretch the statute so as to increase the powers therein granted. If the case is en-

tirely right we went too far in *Walsh v. People,* but now we are asked to go a step farther.

The position of plaintiff in error is strongly supported by *People v. Forquer,* 1 Ill. 104. The doubts expressed by the court in that case and quoted by counsel for defendant in error, relate to a point other than that now before us. To the same effect is *Brady v. Howe,* 50 Miss. 607. It is there assumed that "occur" means "arise," "begin," and it is held that the governor cannot appoint to fill a vacancy that occurred, i. e., began during session. Mecham on Public Officers, section 136, is also strong in support of this position. These and other less precise authorities and the other considerations above expressed constrain us, notwithstanding the opinions of the federal attorneys general and the other citations of the defendants in error, to say that "occur" means "arise," "begin," and not "exist." It follows that the governor cannot make an ad interim appointment in the present case, but must await the session of the senate or call a special session.

The judgment of the district court is reversed with directions to dismiss the case.

MR. JUSTICE CAMPBELL and MR. JUSTICE ADAMS dissent.

MR. JUSTICE CAMPBELL dissenting.

Were it not for provisions in our Constitution which are different from those in the constitutions of other states, and if the case was one of first impression in this jurisdiction, this court, upon the ground that it is the better doctrine, might, though I think it should not, follow that line of authority which is supposed to sustain the view taken in the majority opinion. Acknowledging the ability and integrity of the writer of the majority opinion and his concurring associates, and mindful of the desire we all have for unanimous decisions especially in political or semi-political controversies, I cannot assent to what seems to me, though not to the majority, to be an unwarranted departure from the sound and salutary contrary view

hitherto adopted by this court after thorough argument and long consideration in several of our cases.

Where property rights are involved our courts usually enforce stare decisis, and while they unquestionably have power to overrule their former decisions, they deem it better to adhere to the law when once settled after mature deliberation, so that property owners may know their rights and act accordingly, than thereafter to change the law because the same or different judges may prefer another rule. In cases of a political nature it is equally desirable for courts to stick to decisions once so made and to apply their doctrine in future cases and for a similar reason, and the additional one, that they may retain the confidence of worthy citizens who, regardless of political affiliation, rightly or not, are prone to resent change or shifting of position in such controversies as colored by political prejudice or influence.

This statement must not be taken even as an indirect suggestion that in this departure any improper motive has entered any more than that this dissent is the result of a similar motive. We all recognize that such differences of opinion not infrequently arise. Whatever their political preference may be as individuals, judges should be, and I am sure that in this case they are, indifferent as to the parties thereto and as to party or factional affiliation, and be governed solely by the law.

That I am not mistaken in the statement that there has been a departure from, if not an overruling of, our previous cases the language of the opinion itself is invoked. In referring to a cited California case the writer says that if it is entirely right, "We went too far in *Walsh v. People,* but now we are asked to go a step farther." Not only does the opinion decline to take that step but it retraces the step therein taken and advances several steps in the opposite direction. And this leads me further to comment upon that and other cases of this court because, in my judgment, they sustain the judgment of the district court in the instant case. The Walsh case was decided in Sep-

tember, 1922, and concurred in by all the judges. The controversy was between rival claimants to the statutory office of public trustee of Weld county and the decision was based upon the same constitutional provisions that are here involved. Walsh was appointed as trustee by Governor Gunter in 1919. In 1922 Governor Shoup, deeming that the term of Walsh had expired, during a recess of the senate appointed McClenahan as his successor. Upon Walsh's refusal of the demand of McClenahan for admission to the office, the latter brought quo warranto to oust him and establish his own title. The district court ousted Walsh and he brought error. The only difference in the facts between that case and the instant case—whether it be substantial or immaterial to be discussed later—so far as concerns the authority of the governor to act, is that in the Walsh case the term of office expired when the senate was not in session while in this case respondent Murphy's term expired when the senate was in session. In his case Walsh's contention, and it was the controlling question there, is precisely the same as respondent Murphy's chief contention here, and in both cases decision hinges on its resolution. This claim was and is that when the term of a public officer expires during a session of the senate "the ending of the incumbent's term is not effectual until followed by the legal appointment and qualification of a successor", as provided in article IV, section 6. In other words, until a permanent appointment has been made as the result of the combined act of the governor in making the nomination followed by consent thereto by the senate. It was conceded by Walsh's counsel, as it is by respondent here, that the ending of a term does give rise to a vacancy, but only in the qualified sense just indicated. This court in the Walsh case in rejecting this notion of a restricted or qualified vacancy, thus stated the position of Walsh: "He (Walsh) claims, however, that the expiration of a term does not create a vacancy which will justify an appointment under section 6 of article IV because under section 1 of article

XII, the incumbent holds over as an officer not merely with power to discharge the duties of the office, and that the governor must therefore await the session of the senate before he appoints a successor." The court then said that the answer to this was the section itself and in the course of the opinion it was said that when the term of an incumbent expires a vacancy is created; that the incumbent does not hold over or continue in office at all, but merely is entitled to discharge or exercise the duties of the office, and, therefore, is a mere locum tenens during the vacancy, that is, he is in on sufferance; and when the term does expire there is a vacancy which authorizes the governor, (italics mine), *not to make a permanent appointment,* (which could be brought about only by the concurrent acts of the governor and the senate), but to make *an ad interim appointment,* and the person so appointed is not competent completely to fill the vacancy thus created, but his function is merely to discharge or exercise the duties of the office until the next meeting of the senate when it becomes the duty of the governor, if he desires the temporary appointment to become a permanent one, to submit such nomination or appointment to the senate for its approval and meanwhile such ad interim appointment is valid and authorized under our Constitution. If these declarations of the Walsh opinion are not directly contradictory to, and inconsistent with, the decision here I am at a loss fitly to characterize their effect.

Furthermore, the court in the Walsh opinion cites with approval *People v. Scott,* 52 Colo. 59, 120 Pac. 126, where in an elaborate opinion by Mr. Justice Musser, the same result was reached and he refers with approval to *People v. De Guelle,* 47 Colo. 13, 21, 105 Pac. 1110, opinion by Mr. Justice White. In this Scott case this court sustained the validity of the Court of Appeals Act. Judge Musser's opinion, among other things, held that a vacancy in the office arose when the creating statute was enacted and before the first appointment of the judges. This is a familiar doctrine. The appointment by Governor Shafroth of

the first judges of that tribunal was upheld, though it was made when the senate was not in session, not withstanding the act provided that the nomination or appointmen by the governor must be approved before the judges can qualify. We held there that the judges could qualify and were competent to discharge their duties until the next session of the senate. In other words, a vacancy occurred and continued to exist from the moment of the passage of the act. The bill for the act creating the Court of Appeals was passed with an emergency clause and it therefore became a law, as declared by the General Assembly, "from and after its passage." Unless the bill should be vetoed by the governor, the inception of the bill as a law began the moment of its passage. Governor Shafroth did not veto it, took no action whatever, except to file it with the secretary of state as our laws require in such a case. It thus appears that while the General Assembly was still in session, and before the senate adjourned, this bill became a law and was in effect. And from the moment it became a law a vacancy was created. It "occurred" during a session of the senate. It might have been, but was not, "filled" by a permanent appointment before the senate adjourned. Why it was not we do not know. Here then we have a decision by this court in the Scott case that where a vacancy occurred during a session of the senate, though it was not filled during the session, either because of inability or failure of the senate to act, the governor in such a case was authorized to make, and he did make, an ad interim appointment of the judges who could and did discharge their duties until the next session of the senate, although the vacancy in the office "occurred" while the senate was still in session, and the act expressly declared that "no such appointment shall take effect until a confirmation thereof by the senate". So I say, and the statement is based on the record, that in the Scott case we held that the governor had the power to make an ad interim appointment where the senate did not act and where the vacancy occurred during its session. There was not

only in the Scott case an inability but also a failure of the senate to act. What possible difference in the result could there be between failure and inability to act? The senate might have acted but it failed to do so. In the Scott case the court said that the constitutional provision for ad interim appointments refers to cases where the joint action of the governor and senate is necessary to fill a vacancy, but that the governor in making an ad interim appointment does not fill a vacancy at all. This announcement was approved in the Walsh case. If, as was held in the Scott case, and the Walsh case approved the doctrine, it was competent for the governor to make a first appointment of the Court of Appeals judges after the senate adjourned, which appointment authorized them to hold over and discharge the duties of the office until the next session of the senate, notwithstanding the creating act said that before the judges could qualify they must have the approval of the senate, it necessarily and logically follows therefrom, under the same provisions of the Constitution, that where a vacancy occurs during the session of the senate, as it did in the Scott case, and the senate, either because the nomination has not been submitted to it or because the governor's nomination is not acceptable, or the senate is unable or fails to act during its session, the governor thereafter and in vacation, though he may not completely fill such a vacancy by a permanent appointment may nevertheless, make an ad interim appointment which does not fill the vacancy but merely authorizes the person selected to discharge or exercise the duties of the office until the next meeting of the senate. We adopted this view in the Scott case, approved in the Walsh case, and further held that even though the governor in such a case assumed to fill the vacancy by a permanent appointment, his act must be construed as intended to do what he lawfully might, that is, appoint to discharge the duties until the senate meets.

Governor Morley in making this appointment of the relator Lehman fully conformed with and followed the

doctrine of these cases. Two additional cases cited in the Walsh case (*In Re. House Bill 38,* 9 Colo. 632, 21 Pac. 474, and *People, ex rel. v. Reid,* 11 Colo. 138, 17 Pac. 302) are cited as supporting its conclusion. But it may be said in this connection, and it is said by counsel for respondent who emphasize the fact, that though the term of the respondent Murphy expired January 13, 1925, the day the General Assembly convened, the governor did not send Lehman's name to the senate until April 16, 1925, the day the General Assembly adjourned, which was a failure on his part to perform his official duty. And they say that this illustrates how a scheming governor, when the term of a public officer expires by limitation during the session of the senate, may delay nomination of his successor until after its adjournment and thus evade the constitutional requirement that an appointment must receive the consent of the senate, and thereafter be free to appoint his own choice who might not be acceptable, who would hold until the next session of the senate or for a period of about two years. That is true as to a permanent appointment but not at all true as to an ad interim appointment which does not ever require in any circumstances the senate's consent. Moreover, though counsel are not oblivious of the fact, they do not refer to it in argument, precisely the same criticism or observation equally applies to a scheming senate. To illustrate concretely: A Republican incumbent's term expires on the first day of the Legislative session, a Democratic governor in such circumstances nominates a Democrat and sends his name to the senate for confirmation on that first day, a Republican senate refuses to take any action at all during its entire session and thereby leaves in office a Republican incumbent of an expired term for a period of two years after his term expired and thus takes away the constitutional power of the governor to make an ad interim appointment to hold until the next session. In neither of the supposed cases, however, does the argument go to the power but rather to the abuse of power by public officials. In a republican

form of government power must be lodged somewhere and in some person or tribunal, but that is no argument against its having been so lodged. For an abuse of power vested either in the governor or the senate they are responsible at the bar of public opinion or become subject to indictment or impeachment. Neither this nor any other court can transcend its constitutional authority by assuming to impose upon either the appropriate punishment for abuse or misuse of a power which either unquestionably possesses. Were it not for the argument of respondent, fallacious when taken in consideration with all the facts, we would not pause in the discussion to complete the statement of facts in order to have the record show what was done by the governor and the senate as affecting this office. The statement of facts in their briefs by learned counsel for respondent is correct so far as it goes. To it, however, there should be added that during the session of the senate and on January 16, 1925, three days after that body as one branch of the General Assembly had convened, the governor submitted to the senate the name of Charles L. Chatfield as his nominee for appointment as civil engineer member of the state board of land commissioners as the successor to respondent Murphy, whose term expired on the 13th day of January, the day the senate convened. Courts take judicial knowledge of certain facts. It has often been said that they will not close their eyes as judges to what they know as men. This is illustrated here by the proper examination by the writer of the majority opinion of the proceedings of the constitutional convention in tracing the passage through that body of a section of our present Constitution. These proceedings were not set forth or even referred to in this record, but the author of the opinion properly availed himself of their contents. So here, the present record of this case does not contain the facts above recited but the opportunity of consulting the files and records in the office of the governor and of the senate has been availed of with the result just stated. This nomination of Chatfield was withdrawn

January 21, 1925, after having remained with the senate for five days. Whether any action thereon was had by the senate; whether, as is not uncommon in such circumstances, a suggestion from that body to the governor that the nomination was not acceptable to the senate and should be withdrawn to save the nominee the humiliation resulting from a rejection, and to maintain cordial relations between the two branches of the appointing power, we have no information. It is not important, however, as the governor has the power, before the senate takes action, to withdraw his nomination.

The respondent's argument that the governor wholly disregarded his duty by failing to send to the senate during its session a nomination for its consent is not borne out by the facts. Not only did the governor in sending the name of Chatfield comply with all requirements but compliance was again had when the nomination of Lehman was sent to the senate on the last day of its session and, in my judgment, if we adhere to our previous decisions the governor was strictly and without question also within his rights when he made the ad interim appointment of Lehman after the session of the General Assembly adjourned. The entire discussion as to the propriety or impropriety of the acts of either constitutent of the appointment power is irrelevant at this time. The governor was acting within his rights; the senate was acting within its right in declining to take action. It is not for this court to pass upon the motives of either, but to assume that each one in good faith was properly discharging official duty.

As preliminary to further discussion of the ground on which the majority put their reversal, the following summary is made of what I say are our previous holdings, though it involves a repetition: (1) The expiration of a fixed term of a public officer gives rise to an absolute vacancy therein. (2) This vacancy, whenever it occurs, may not be completely filled except by the concurring acts of the two constituent factors of the appointing power, the governor and the senate. These acts need not necessarily

be concurrent in point of time but concurrent in the sense of co-operation or joining or association in the same act. (3) When the senate is in session it is the duty of the governor to submit to that body his nomination, if it be for a full term, for its consent. (4) When the senate is not in session, though the governor by his act alone may not then make a permanent or completed appointment for a full term or part of an unexpired term, or completely fill up the vacancy arising by reason of the expiration of a previous term of the incumbent, he may by himself alone make an ad interim appointment, irrespective of the time when the vacancy occurs, which commissions the person so selected to exercise the duties of the office until the next session of the senate and then it is the duty of the governor, if he desires the provisional or temporary appointment to ripen into a permanent one, to submit the name of the nominee to the senate for confirmation. (5) Necessarily, according to my construction of our decisions, they make wholly immaterial the time when the vacancy occurs, whether it be during a session or in vacation. (6) An ad interim appointment which the governor is authorized to make is not the filling of a vacancy at all, or an appointment for a full or complete term, but its effect is merely an authorization to the person chosen, who is a mere locum tenens, to discharge or exercise the duties of the office temporarily and until a permanent appointment may be made at the next session of the senate. Since, therefore, an ad interim appointment, according to our previous decisions, is not the filling of a vacancy, but merely a temporary selection, the consent of the senate is not necessary and it is immaterial when the vacancy occurs. If it occurs when the senate is in session only a permanent appointment may then be made by the concurring acts of the governor and the senate; but if through failure or inability of the senate while in session to act upon a nomination to fill the vacancy, that vacancy continues to exist and runs over into the recess and a temporary appointment, as here, may be made by the governor

during the recess which continues until the next session of the senate. Failure, neglect or inability of the senate during its session to give consent does not deprive the governor of his constitutional power to make such an ad interim appointment.

My conclusion that the foregoing has been decided by this court, though the majority disagree with what is said as to "failure", as distinguished from "inability", to act is fortified by contrasting our decisions with those of other states, especially with the decisions of the Supreme Court of Wyoming which are typical of those in other jurisdictions supposed to be opposed to our conclusion in the Walsh case and which are relied upon by the respondent. A difference of opinion between our decisions and the other ones referred to may be accounted for by a difference in the phraseology of the respective constitutions and that in some, if not all, of these other jurisdictions ad interim appointments are not recognized. In the Walsh case the opinion refers with disapproval to *State, ex rel. v. Henderson,* 4 Wyo. 535, 35 Pac. 517, 22 L. R. A. 751, and *Ballantyne v. Bower,* 17 Wyo. 356, 99 Pac. 869, 17 Ann. Cas. 82, because they are to the effect that an incumbent holds over or continues in office after the expiration of his term and not as with us as a mere locum tenens. The opinion also states that the Wyoming cases are based on a constitutional provision indentical with ours, and contrary to our conclusion, but with great respect for that court we think it misconstrues the section. In a late decision by the Supreme court of Wyoming, after the Walsh case was decided, the Supreme Court of Wyoming, in *People v. Shawver,* 30 Wyo. 366, 222 Pac. 11, Chief Justice Potter in an elaborate opinion refers to our Walsh decision and makes the point, which I think is a good one, that it seems to have been based upon a provision of our Constitution different from theirs in that, in our organic act, the governor is authorized, in case of a vacancy, to appoint ad interim a person "to discharge the duties of the office until the next meeting of the senate, when he

shall nominate some person to fill such office", while in Wyoming the incumbent holds over or continues in office until his successor is appointed and qualifies. The Chief Justice, with characteristic courtesy, suggests that this accounts for the difference in the decision of the two courts, although he reiterates that their former decisions rejected by us will not be disapproved. The entire discussion in the Shawver case and its interpretation of our decision in the Walsh case coincide with and sustain the view taken in this dissenting opinion, that this court in the Walsh case and other cases has established a doctrine contrary to the one that prevails in Wyoming, and that the Wyoming doctrine is typical of and similar to the decisions of other states which are relied upon by the respondent Murphy here, and is the one on which his counsel have rested their entire argument in favor of a reversal.

But if the Walsh case is not, as the majority opinion says, decisive of this one, because the word "occur" was not there involved, nevertheless, the decision below is right according to the great weight of authority and reason. And to a demonstration of that contention I now proceed, first observing that if "occur" was not involved in the Walsh case, it was, in my judgment, because the court there thought, and as I continue to think, it is immaterial when the vacancy occurred. The court evidently then thought it was immaterial because it held, following the Scott case, that though the expiration of a fixed term creates a vacancy which can be completely filled when the senate is in session only by the concurrent acts of the governor and the senate, yet if not so filled, then in recess the governor may appoint some one to fill it temporarily. If this court in the Walsh case had supposed, as the majority seem to here, that the governor could not, without the consent of the senate, make an ad interim appointment when the vacancy occurred during the session of the senate, it would have said so in so many words and that would have ended the opinion in that case; but instead of saying so we then put the decision upon another ground, as just in-

dicated, necessarily and logically assuming that the time the vacancy began had no bearing upon such a question as we now have before us.

The majority opinion, however, without discussing the Walsh case but merely indicating that if the Tilton case was entirely right, we went too far therein, now takes a position which I think is essentially different from the one we adopted in the Walsh and other cases already considered. After thus stating that the meaning of the word "occur" was not involved in the Walsh case, and therefore not controlling here, it is said the only question now before us is as to the sense in which "occur" is used in section 6 of article IV of our Constitution; that the word "occur" carries to the mind "a sense of origin, beginning, not a mere existence or continuation". The opinion further states that in the various opinions of the courts on this subject the "writers, apparently unconsciously, often used the word in the sense of begin but never, we believe in the sense of exist". It is with great deference submitted that this statement is not correct. In the research of counsel in this case, followed by a diligent search by me, no case has been cited or found where any such definition as is suggested in the majority opinion, has even been squinted at. Even in the opinion of Judge Cadwalader, hereinafter referred to, there is no suggestion that the definition in the majority opinion was in his mind. Many other decisions, some of which will be later referred to, are directly contrary to the observation just referred to. It is also said that in the proceedings of our constitutional convention, and I assume the opinion correctly discloses all that occurred on that subject, the proposed article of the constitution before the convention appeared in three forms. At one time the word "happen" is used, at another time "in case of a vacancy", and again "occur" at another. The opinion states that Judge Wells, chairman of the committee on revision and adjustment, knew what words meant and how to use them, and that if the intention had been to give the governor power to fill vacancies

which began before, but continued into, a recess of the senate, it is reasonable to suppose that the sentence would have been left as the committee of the whole had framed it, or if the committee had wished to follow the ideas of the attorneys general of the United States it would have adhered to the original draft in which the word "happen" was employed. The writer recognizes that his argument based upon these proceedings is not conclusive and admits that the Supreme Court of New Jersey said that such an argument is not of any weight whatever in a situation precisely the same as that in the instant case. It is respectfully submitted that the opinion itself does not observe the distinction which its learned writer clearly drew in the Walsh case between the power of the governor to fill vacancies, that is, to make a permanent appointment, and the governor's power to make an ad interim appointment which we held both in the Walsh and in the Scott cases was not the filling of a vacancy at all. And so a sufficient answer to what is said about the proceedings of the constitutional convention is the reasoning in the Walsh case. But let us proceed further. I concur in what is said as to the learning and ability of Judge Wells. I go farther than the opinion does and say that Judge Wells undoubtedly knew not only the meaning of "happen" and "occur" as used at different times in the drafts of this article, but he also knew well, for he was especially strong in his knowledge of cases and of precedents and of previous decisions of courts, as to the meaning of these words and that they were synonymous, and may have used "occur" in the final draft because to his sensitive linguistic ear it was more euphonious. He also knew the definitions of "occur" in the standard dictionaries and the meaning as given in law dictionaries as well as by the different courts of the country. The corresponding provision of the Constitution of the United States is article II, clause 3 of section 2, reading: "The president shall have power to fill up all vacancies that may *happen* during the recess of the senate, by granting commissions, which shall ex-

pire at the end of their next session". It will be observed by comparing this with section 6 of article IV of our constitution, reading: "If during the recess of the senate a vacancy *occur* in any such office, the governor shall appoint some fit person to discharge the duties thereof until the next meeting of the senate", that the only difference between the two provisions is that in the Federal Constitution "happen" is employed and in our Constitution "occur" is used. If this case is to be resolved by a contest in etymology I think that the definition in the opinion cannot stand. I do not find in any dictionary or in any law treatise, that the word carries merely a sense of origin or beginning, or that such is its meaning here. The word comes from two Latin words: "ob" signifying "to, toward, * * * upon or over", and "currere", "to run". As thus combined the two words would seem not to carry to the mind the sense of origin or beginning but rather of continuance. "Running" implies motion, movement, is not static, and does not pertain to bodies at rest. The dictionaries themselves are opposed to the meaning assigned in the opinion. In Webster's New International Dictionary the author says: "occur, happen are often used without distinction". Not a single authority has been cited in the opinion that "begin" is synonymous with "occur". To the contrary the law dictionaries and the judicial opinions say that as used in constitutions and statutes "happen" and "occur" are synonymous terms and each is synonymous with "exist". If a vacancy "occurred" during the senate's session, its continuity was uninterrupted until it was filled either permanently or temporarily. Though it began when the senate was sitting, its beginning was not its ending unless it was completely filled the moment it began. Logically, if the vacancy does not continue after the beginning but stops there, it cannot be filled at all unless a permanent appointment is made on the same day it began. Such is not the meaning of "occur". A vacancy that "occurs" during a session does not end, as we have said, until filled in one of two ways. Counsel concede it

may be filled at any time during the session, even ninety days after the session began. The primary meaning of "occur" involves progression, movement, continuity. A vacancy in an office, if not filled in one of two ways, continues and "exists" after adjournment just as much as it did before, and the same necessity for filling obtains after as before. It existed in this case when the governor made a temporary appointment during recess. The incumbent of the office may not complain of the inability, neglect or failure of the governor and the senate to agree upon his successor while the senate was in session or that the governor, upon such inability, failure or neglect, proceeded, as he might under the Constitution, to make an appointment ad interim which destroyed the incumbent's right as a mere locum tenens. He did not, as in Wyoming and other states, hold over or continue in office until his successor was duly appointed and qualified. In the Walsh case we held he did not hold over or continue in office at all. If the senate and governor cannot agree during the session on the incumbent's successor the situation is exactly as if there was no incumbent at all or as if the incumbent had died or resigned. If in such a case as death of the incumbent the senate and governor cannot agree during the session upon a successor, there would be a vacancy both in the office and the term. To illustrate: Take the important office of commissioner of insurance. He is appointed by the governor with the consent of the senate. Suppose he dies during a session of the senate. The governor sends to the senate while in session several nominations of a successor, but the senate, as it rightfully might, refuses its consent to each nominee. The session of the senate comes to a close and the office is still unfilled. Is it conceivable that our constitutional convention has so far failed in its duty as not to have provided for such a contingency? To fit just such a case, among others, our constitutional convention inserted in our organic act a clause authorizing the governor, in such a contingency, to make an ad interim appointment to hold till the next

session. It .is no answer to say that the governor may convene the senate in extraordinary session for the transaction of executive business and then re-submit the nominations or make new ones. If so convened it would be, not a newly elected body, but the same senate that had repeatedly refused to consent to the several nominations theretofore submitted and rejected, and the likelihood of a repetition of rejections is too great to warrant a belief that on being reconvened the situation would be different or in any wise relieved. Now let us further see what meaning is assigned to "occur" by the dictionaries and lexicographers. Webster defines the verb "to occur"; "to be found or met with; * * to appear; to happen; to take place". He says: "To happen, in modern usage, has lost almost entirely its earlier implication of chance, and signifies merely to take place or occur". The Century Dictionary: "To be found; to be met with" and a quotation is there given saying that it is synonymous with the word "exist". In Roget's Thesaurus, in treating of the state of "being" the word "occur" as used is equivalent to "exist."

Let us see what the courts say. One of the leading cases is *Fritts v. Kuhl*, 51 N. J. L. 191, 17 Atl. 102, and the facts of that case are almost identical with those in this case. It is most exhaustive and in the course of the opinion it is stated that the executive journals show that from the time of the adoption of the Constitution of the United States, in advising the president of his right and power to fill during a recess of the senate a vacancy which had begun during its preceding session, not less than ten of the prominent men who occupied at different times the office of attorney general, informed the president that he had such power and in construing the word "happen" treated the same as synonymous with "occur", and each with "exist". During the administration of President Monroe, in 1823, Mr. Wirt, who was then attorney general, in advising the president that he had such power, in concluding a lucid argument, used the following remarkably clear and explicit language which so well states

the doctrine that it is here reproduced: "The meaning of the Constitution seems to me to result in this: that the president alone cannot make a permanent appointment to those offices; that to render the appointment permanent, it must receive the consent of the senate; but that, whensoever a vacancy shall exist which the public interests require to be immediately filled, and in filling which the advice and consent of the senate cannot be immediately asked, because of the recess, the president shall have the power of filling it by an appointment to continue only until the senate shall have passed upon it; or, in the language of the Constitution, till the end of the next session. * * * In reason, it seems to me perfectly immaterial when the vacancy first arose; for, whether it arose during the session of the senate or during their recess, it equally requires to be filled. The Constitution does not look to the moment of the origin of the vacancy, but to the state of things at the point of time at which the president is called on to act."

In 1825 President John Quincy Adams adopted this construction in his appointment of Amos Binney as a navy agent for the port of Boston. In 1832, during the administration of President Jackson, Attorney General Taney, who afterwards was appointed by Jackson Chief Justice of the Supreme Court of the United States, gave an opinion in which he accepted the interpretation of his predecessor and held that the meaning of the clause of the constitution is: "If there happen to be any vacancies during the recess" the president may make a temporary appointment as stated by Mr. Wirt. As further enforcing his views, Attorney General Taney gives instances in which it cannot be imagined that the power to act in recess was intended to be withheld from the president, and thus says: "An officer may die abroad or be in a distant part of the country, and his death not be known until after adjournment, or a nomination may be confirmed by the senate, and the appointee may refuse to accept after adjournment." If then the president has not the power after the senate has

adjourned to fill a vacancy which began during the session, what would be the condition of affairs in the instances just cited? Jackson himself was a lawyer, and every student of history and biography knows that he would not have acted on his attorney general's advice had he not believed it was sound.

In 1841, Mr. Legare, Attorney General, expressed a like opinion and this was concurred in by Attorney General Mason in 1846, Vol. 4 of Opinions, p. 523. In 1855, Attorney General Cushing, (one of the ablest lawyers this country has ever known), referring to the opinions of his predecessors in office said: "They have thoroughly demonstrated and conclusively established, as a doctrine of administrative law, that the expression of the Constitution, 'all vacancies that may happen,' signifies 'all vacancies that may happen to exist in the recess,' or 'when there happens to be any vacancies in the recess.' And they concur in the general statement, that howsoever a vacancy happens to exist, if it exist it may be filled by temporary appointment of the president." To the same effect are the opinions of Attorney General Bates in 1862, and Attorney General Speed in 1865, and Attorney General Stanbery in 1866. In this opinion of Attorney General Stanbery the conclusion was reached that the president has full and independent power to fill vacancies in recesses of the senate, without any limitation as to the time when they first occur. Again in 1868, Mr. Evarts, in a very carefully prepared opinion said that when the vacancy occurs while the senate is in session and is continuing, through the failure of the senate to confirm a successor, the president during a recess of the senate could make a temporary appointment.

There is as already stated only one decision referred to in the text books or found in the reported cases, so far as I have been able to discover, that takes a contrary view. That was by Judge Cadwalader of the United States District Court of Pennsylvania. District Attorney Cases, 7 Amer. Law Reg. 786. Ten years later Justice Woods, of the United States Supreme Court sitting in the Georgia

Circuit, held directly contrary to the opinion of Judge Cadwalader. *In re Farrow*, 3 Fed. 112. This is considered one of the leading cases. The opinion is too long for reproduction here. It sustains the official view of every attorney general of the United States who has passed upon the question—more than ten of them—among the leading and best lawyers of the country. It is true that their opinions are not judicial decisions, and are not precedents in the same sense, but it is respectfully submitted that the opinions of such great lawyers, and the action of different presidents of the United States from the beginning of our National Government ought not to be lightly disregarded by basing a contrary decision upon the supposed meaning of "occur" assigned to it in the majority opinion when there is not a decided case in this country and not a definition by lexicographers, lay or judicial, that adopts such an interpretation. Not even in the case of Judge Cadwalader is such a meaning attributed to "occur". Mr. Justice Woods, of the Supreme Court of the United States, in referring to Judge Cadwalader's opinion says that it is unsupported by any other case and should not be held to outweigh the authority of the great number which are cited in support of the opposite view, and of the uniform practice of the executive department of the United States for nearly sixty years, the acquiescence of the senate therein, and the recognition of the power by both houses of congress. It would unnecessarily encumber this opinion to cite the large number of cases so holding. They will be found in the opinions already mentioned. Two additional cases are pertinent. In *Johnson v. Humboldt Ins. Co.*, 91 Ill. 92, (33 Am. Rep. 47) the court says, at page 95: "The word 'occur' means 'to happen', in its general and most popular sense."

One of the leading ones is *Richardson v. Young*, 122 Tenn. 471, 125 S. W. 664. The opinion is an elaborate one by Mr. Justice Shields, a jurist of national repute, and the court itself, learned counsel for respondent here would acknowledge, is an able one. The facts of that case are not

the same as the facts here but the opinion is particularly valuable because of the discussion on pages 550 to 565 as to the meaning of "occur". The case approved of the Farrow case supra, and sustains and enforces the doctrine recognized by all the decisions, except the single one by Judge Cadwalader. The conclusion was that "occur" includes vacancies that may exist during recess without regard to when the office became vacant. Here we have a decision by the highest court of Tennessee in consonance with the views of President Jackson, its most distinguished citizen. So I say that the definition of "occur" assigned to it in the majority opinion, and admittedly the ground for the conclusion of reversal, is not supported by any lexicographer or by the decision of any court, and is contrary to the holdings of all the courts save one, that have spoken upon the subject which hold that "occur" is synonymous with "happen" and each is synonymous with "exist."

At the late session of Congress, after the senate in session had refused its consent to the appointment of Mr. Warren as Attorney General, President Coolidge's expressed intention, if Mr. Warren would accept it, to give him a temporary recess appointment shows that President Coolidge, doubtless so informed by his able Solicitor General, entertains the same view, and puts upon clause 3 of section 2 of article II of the United States Constitution which in meaning is the same as section 6 of article IV of our state Constitution, the same construction entertained and announced by all of his predecessors in the presidential office under the advice of their legal advisors.

It has been up to this point assumed that section 6 of article IV of our Constitution applies to the office of a member of the state land board and regulates the mode and method of his appointment. Relator's counsel say that it does not because section 9 of article IX, a special and limited section, provides for the appointment of members of that board and fixes their tenures of office and contains no provision whatever for a holding over or continuing in office at the expiration of a term; hence, there is no

limitation on the powers of the governor in making permanent or ad interim appointments of its members. It may be that color is lent to this contention by our decision in *People v. Field,* 66 Colo. 367. In that case, in an opinion by Mr. Justice Scott, it was held that section 9 of article IX is a special provision applicable to the land board only, and controls, as against any general provision of the same instrument, the single board to which it is directed, while the general controls in all cases to which the special does not apply. On that principle it was held in the Field case that the civil service amendment of the Constitution, applying to all offices and officers generally, except as to certain designated exceptions which do not include the land board, do not affect offices of the latter. Judge Scott said among other things that section 9 confers great powers and broad discretion, fixes the tenure of office, and specifically and fully provides for the manner and method of appointment. This opinion it is said logically applied withdraws from the operation of section 6, article IV, officers of the land board because this section concerns only those officers whose appointment is regulated by that article, and not to other officers whose appointment is otherwise provided for in section 9 of article IX or by the General Assembly. As my conclusion is this judgment should be affirmed for the reasons already given, it is unnecessary to pass upon this claim. The argument and the authorities cited in its support have not been overlooked, but as this is a dissenting opinion and does not establish the law in this jurisdiction unnecessary declarations should be avoided, particularly as my conviction is that the judgment below should be affirmed for the reasons already given.

MR. JUSTICE ADAMS dissenting.

The scholarly and exhaustive analysis of the issues by Mr. Justice Campbell in his dissenting opinion seems to me to be unanswerable, leaving little if anything further to be said, but I venture to add a brief statement of my own views in the matter.

I think that the principles announced in *Walsh v. People,*
72 Colo. 406, 211 Pac. 646 are applicable and that they
should be followed here. The majority decision in this
case seems to me to mark a step toward perpetual tenure
in office, contrary to both the letter and the spirit of the
law, and as said in the Walsh case, "Statutes should be
construed according to their reason and spirit, rather than
their letter". (72 Colo. 406, 412, 211 Pac. 646). The idea
of "remaining in office forever", quoting again from the
Walsh case is a situation that was there justly frowned
upon by the court, referring of course to the insistence
of an office holder holding on beyond his alloted term, with-
out official sanction, and not to a reappointment or reelec-
tion coming as a reward for faithful public service. The
wholesome principles followed in the Walsh case obtained
generous endorsement there and should here, but they
seem to find themselves unemployed in this case.

Under the rule of stare decisis I think that the Walsh
precedent should have been followed; the rule ought never
to be suspended without good reason; it should never be
discarded when it involves even a temporary though unin-
tentional forgetfulness of principles so firmly grounded
in the public conscience as the excellent ones announced in
the Walsh case quoted above.

As pointed out by Mr. Justice Campbell in his dissenting
opinion, the Presidents of the United States, acting upon
the advice of successive heads of the Department of
Justice, the Attorneys General, in construing a provision
of the United States Constitution similar to ours, have for
generations adopted the meaning contended for by the de-
fendant in error in this case, but which has been denied
him. The main opinion points out that article II, section
2, paragraph 3 of the United States Constitution refers to
vacancies that may "happen", while in the Colorado Con-
stitution the word "occur" is used. But what of this?
These words are often used interchangeably, or as synon-
omous terms. See dictionary definitions of both words.
A writer or speaker might use a half dozen different

words, drawn from the inexhaustible wealth of the English language, to express the same idea, or even to emphasize it. To ask why the framers of the Colorado Constitution did not choose one word instead of another, when they both appear to have the same meaning, or to suppose that merely because there may be an absence of Spencerian copy book precision in the use of words, that therefore they obviously must have an opposite meaning, to my mind is on a par with an argument that might be made that because mens' handwriting is different, that therefore their meaning must be different. I say this with all due deference to the learned writer of the main opinion and to all of the other members of this court, for all of whom I have a deep and genuine respect. To follow the precedents observed for so many years by the Presidents of the United States through different administrations would certainly not lessen the prestige of this court, but should strengthen it.

At the oral argument it was admitted by counsel for plaintiff in error that the governor had sent another nomination to the senate while it was in session, but that the senate had failed to act upon it, although it appeared that there was ample time so to do, and that the governor withdrew the nomination and later sent in Lehman's name. I refer to this only because the statement in the main opinion in this case to the effect that the Lehman nomination was sent in when the senate was about to adjourn, might otherwise be misconstrued. In the Federal courts, at least, cases are often decided by busy judges upon opening statements of counsel, without minute reference or without necessarily any reference to the pleadings. It saves time and I think that it should have been done in this case and the writ dismissed.

There is no question in the present case involving the qualifications or fitness of either of the respective contestants to hold the office. Neither is the good faith of either the senate or the governor open to question or debate in this action. It is only for the purpose of determining who

is entitled to the office, and I think that the issues should be found in favor of the defendant in error.

For the above reasons, I respectfully dissent.